**RESERVATION TELEPHONE CO-OPERATIVE, a North Dakota Corporation, Plaintiff,**

**v.**

**Danile J.W. HENRY, et al., Defendants.**

**West River Telecommunications Cooperative, Plaintiff,**

**v.**

**Danile J.W. Henry, et al., Defendants.**

**Nos. A4–02–121, A4–02–126.**

United States District Court, D. North Dakota, Northwestern Division.

Aug. 26, 2003.

See also 76 F.3d 181.

---

Michael J. Geiermann, Rolfson Schulz Lervick & Geiermann, Bismarck, ND, Gregory Lawrence Lange, Richardson, Isakson & Lange, Hazen, ND, for Plaintiffs.

Hans Walker, Jr., Michael L. Roy, Hobbs Straus Dean & Walker LLP, Washington, DC, for Defendants.

### ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

HOVLAND, Chief Judge.

Before the Court are Motions for Summary Judgment filed by the Plaintiff, Reservation Telephone Cooperative, in *Reservation Telephone Cooperative, a North Dakota Corporation v. Danile J.W. Henry, et al.*, Case No. A4–02–121; and by the Plaintiff, West River Telecommunications Cooperative, in *West River Telecommunications Cooperative v. Danile J.W. Henry, et al.*, Case No. A4–02–126. The Defendants filed a Cross–Motion for Summary Judgment on June 16, 2003. The Plaintiffs had commenced an action against the Three Affiliated Tribes and the Tax Director for injunctive and declaratory relief alleging that a possessory interest tax imposed by the Three Affiliated Tribes cannot be assessed against rights-of-way and telephone lines granted and used by the Cooperatives throughout the Fort Berthold Indian Reservation. For the reasons outlined below, the Court **GRANTS** the Plaintiff's Motions for Summary Judgment.

### I. *BACKGROUND OF THE CASE*

The Plaintiffs, Reservation Telephone Cooperative and West River Telecommunications Cooperative (hereinafter referred to collectively as the Cooperatives), are two telephone cooperatives incorporated under North Dakota law who provide telecommunications services to the Fort Berthold Indian Reservation located within Mercer County, North Dakota. The Fort Berthold Indian Reservation (Reservation) is home to three tribes; namely, the Mandan, the Hidatsa, and the Arikara. The Tribal Government is located in New Town, North Dakota.

Reservation Telephone Cooperative (RTC) is a non-Indian entity headquartered in Parshall, North Dakota. RTC provides its members with telephone, Internet, and cable television services as well as goods such as telephones and other electrical equipment. The goods and services are provided through lease contracts, purchase agreements, and service agreements. RTC serves an area of approximately 7,000 square miles and provides services and goods to both Indians and non-Indians on trust and fee lands within the external boundaries within the Reservation. Approximately 20% of RTC's members are tribal citizens who live within the external boundaries of the Reservation. The telecommunication services to the Reservation are provided through cables which cross Reservation lands by virtue of rights-of-way granted by the Secretary of the Interior. *See* 25 U.S.C. § 319. Approximately 140 miles of the rights-of-way run on non-Indian land and 120 miles run on Indian trust land.

West River Telecommunications Cooperative is also a non-Indian entity incorporated under the laws of North Dakota. It provides telecommunication services and goods to customers within the Reservation but on a smaller scale than RTC. To date, West River Telecommunications Cooperative has constructed a total of 9.74 miles of cable lines within the external boundaries of the Reservation. Approximately 4.3 miles of the corridor lie within non-Indian fee land and 5.44 miles lie within trust land.

In 1901, Congress authorized the Secretary of the Interior to grant rights-of-way over Indian lands for the construction of telephone lines. In 1948, Congress authorized the Secretary to grant rights-of-way for all purposes across trust lands. 25 U.S.C. § 323. The 1948 Act requires that the tribe consent to the grant of right-of-way. Since August of 1951, the Secretary has required by regulation the consent of the tribe or of a majority of owners of the allotment before granting rights-of-way over Indian lands. *See* 25 C.F.R. § 169.26(a).

In 1990, the Three Affiliated Tribes, through its Tribal Business Council, enacted a possessory interest tax which was designed to cover real and personal property interests on all lands, including fee lands, located within the exterior boundaries of the Fort Berthold Reservation and used for business or profit. This possessory interest tax became effective on January 1, 1992, and was designed to include rights-of-way for utility lines. The possessory interest tax is assessed on 100 percent of the actual value of the possessory interest as determined by the Tribal Tax Commission. Section 705 of the Tribal Tax Code sets the tax rate at 1% of the assessed value of the possessory interest. Section 702 defines the type of property to which the tax applies:

The tax levied by this Chapter shall be called the "Possessory Interest Tax" of real and personal property, which includes any right or interest, and actual ownership obtained in a tract of land (trust, restricted, or fee land), within the boundaries of the Fort Berthold Reservation by lease, permit, contract, easement, right-of-way, deed, or other agreement, which authorizes a person ... to use that real and personal property for business ... profit, or use, except as otherwise exempted [under] Section 108 of this Code.

According to the Tribal Tax Code, any person or entity interested in challenging the Tribal Tax Commission's assessment must first initiate an appeal to the Tax Commission. Appeals from final actions of the Tax Commission may then be made to the Tribal Court conditioned upon prepayment of the taxes assessed.

In January of 1992, the Tribal Tax Commission sent tax forms to the Cooperatives with a letter expressing its intent to assess and collect taxes. The Tax Commission subsequently sent a notice to the Cooperatives informing them of the May 30, 1992, deadline for filing returns. There is no indication in the record that the Cooperatives responded to the Tax Commission's actions by availing themselves of the administrative remedies provided for in the Tribal Tax Code. Instead, on May 20, 1992, the Cooperatives filed an action in federal court seeking declaratory injunctive relief. The Cooperatives challenged the tribe's power to charge taxes on Reservation right-of-way interests. The district court initially stayed the action pending the Eighth Circuit's decision in *Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294 (8th Cir.1994), a case challenging the same possessory interest tax at issue in this litigation. The *Duncan Energy* court's decision required the tribally taxed

oil companies to first exhaust tribal remedies. This Court subsequently dismissed the action for failure to exhaust tribal remedies. *Reservation Tel. Co-op. v. Three Affiliated Tribes*, Civil No. A1–92–111 (Jan. 31, 1995) (Judge Patrick A. Conmy). The Cooperatives then appealed the dismissal to the Eighth Circuit Court of Appeals. The Eighth Circuit affirmed the district court's order requiring exhaustion of tribal remedies. *See Reservation Tel. Co-op., et al. v. Three Affiliated Tribes*, 76 F.3d 181 (8th Cir.1996).

Thereafter, the Tax Commission for the Three Affiliated Tribes commenced an action against the Cooperatives in Tribal Court by summons and complaint filed on November 22, 1996. The Tribe filed a complaint for collection of taxes owed for tax years 1992 and 1993. The Cooperatives moved to dismiss the Tribe's complaint on the basis that the Tribal Court lacked subject matter jurisdiction. That motion was denied by the Tribal Court in a Memorandum Opinion and Order dated January 7, 2000. On April 14, 2000, all parties moved for summary judgment of dismissal. The Tribal Court granted summary judgment in favor of the Tax Commission and against the Cooperatives on January 17, 2001. The Cooperatives then appealed to the Northern Plains Intertribal Court of Appeals which affirmed the decision in an Order dated October 17, 2002.

The Cooperatives have now brought these consolidated lawsuits seeking a determination that the possessory interest tax cannot lawfully be imposed against them. The Defendants, all of whom are members of the Tax Commission and the Director of the Tax Commission, contend that the Tribe has the sovereign power and authority to tax the Cooperatives. The case has been lingering for more than a decade.

## II. *LEGAL DISCUSSION*

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir.2000); *see* Fed.R.Civ.P. 56(c). All parties have moved for summary judgment in this case pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

■ This Court has jurisdiction under 28 U.S.C. § 1331 because the question of whether an Indian tribe retains the power to compel a non-Indian property owner to submit to the civil jurisdiction of the Tribal Court is one that must be answered by reference to federal law and is a "federal question" under 28 U.S.C. § 1331. *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Since tribal remedies have been exhausted, the Tribal Court's determination of jurisdiction is an issue of federal law which may be reviewed in the federal district court *de novo*. *Duncan Energy Co. v. Three Affiliated Tribes*, 27 F.3d 1294 (8th Cir.1994), *cert. denied* 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995); *U.S. ex. rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 905 (9th Cir.1994).

### A. *APPLICATION OF MONTANA V. UNITED STATES*

■ In *Montana v. U.S.*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the United States Supreme Court held that a tribe cannot regulate reservation land owned in fee by non-members unless there is an express delegation of power from Congress *or* the regulation meets the criteria for one of the enunciated excep-

tions.[1] Those exceptions encompass situations in which (1) the non-members have entered into consensual relationships with the Tribe, or (2) the non-member action directly threatens the political integrity, economic security, health, or welfare of the tribe. 450 U.S. 544, 555–566, 101 S.Ct. 1245.

The Supreme Court in *Montana* noted that tribes retain the inherent power to protect self-government and to control "internal relations" which the Court narrowly defined as including "the power to punish tribal offenders, ... to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members." 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493. The Court went on to state as follows:

> But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation. *Id.*

In *Montana*, the Supreme Court announced the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe." 450 U.S. 544, 565, 101 S.Ct. 1245. However, the Supreme Court explained that the tribes do retain some attributes of sovereignty:

> "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. 544, 565–566, 101 S.Ct. 1245.

The Supreme Court held in *Montana* that the tribe could not regulate the hunting and fishing activities of non-members on non-tribal land located within the geographical boundaries of the reservation. 450 U.S. at 557, 101 S.Ct. 1245. The Supreme Court said that the tribe's jurisdiction was limited to two instances—where a consensual relationship exists between the tribe and non-members, or where jurisdiction was necessary to preserve tribal sovereignty. The Supreme Court concluded that neither instance applied in *Montana*.

It was not clear in *Montana* whether the status of the persons being regulated, or the status of the land where the hunting and fishing occurred, led the court to develop *Montana's* jurisdictional rule and exceptions. Nevertheless, *Montana* is the landmark case that provides the principals that guide a determination of whether particular activities by non-members implicate the sovereign interests of a tribe to a degree that tribal civil jurisdiction is appropriate. *Montana's* main rule is that absent a treaty or a federal law, a tribe has no civil regulatory authority over non-members subject to the two exceptions outlined above.

The Supreme Court has held that a tribe's power to impose a tax on non-members doing business on tribal or trust lands on the reservations is "an essential

---

**1.** The term "non-Indian fee lands" expressed throughout the *Montana* decision refers to reservation land acquired in fee simple by non-Indian owners.

attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). However, the Supreme Court has also noted that the power to tax is "subject to constraints not imposed on other governmental entities [in that the] Federal Government could take away this power...." 455 U.S. 130, 140–141, 102 S.Ct. 894. Although *Merrion* certainly contains broad language regarding tribal taxation powers, the case does not abrogate *Montana's* main rule.[2]

In 1997, the United States Supreme Court held in *Strate v. A–1 Contractors*, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), that a right-of-way granted to the federal government and crossing through Indian trust land is the equivalent of non-Indian fee land. The Supreme Court held that a tribal court lacked jurisdiction over a civil case between non-members which arose out of a motor vehicle accident on a state highway which traversed the reservation. The Supreme Court held that the grant of a right-of-way to the state, which precluded the tribe from exercising proprietary rights of exclusion, rendered the highway the equivalent of non-Indian fee land. In that decision, the Court stated as follows:

> In the main, the Court explained, "the inherent sovereign powers of an Indian tribe"—those powers a tribe enjoys apart from express provision by treaty or statute—"do not extend to the activities of nonmembers of the tribe." The *Montana* opinion added, however, that in certain circumstances, even where Congress has not expressly authorized

it, tribal civil jurisdiction may encompass nonmembers: "To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565, 566, 101 S.Ct. 1245.

> *Montana* thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non Indian land within a reservation, subject to two exceptions:

> The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe's political integrity, economic security, health, or welfare.

*Strate*, 520 U.S. 438, 446, 117 S.Ct. 1404.

The United States Supreme Court decisions in *Montana* and *Strate* support the proposition that instead of presuming that tribal power exists and searching for statutes or treaties to negate that presumption, the Supreme Court presumes that tribal power does not exist unless Con-

---

**2.** Under *Montana,* tribal taxation power over property located on non-Indian fee land is extremely narrow. *Merrion* lends support to *Montana's* application in this case because, to the extent it expresses an opinion about a tribe's taxation of property located on non-Indian fee land, its language indicates that such a tax would be an impermissible extension of tribal jurisdiction.

gress has said otherwise. *Strate* clearly limits tribal court power over non-members to the *Montana* analysis. *Montana's* main rule that a tribe has no civil authority over non-members is subject only to the following exceptions; namely, that (1) a tribe may regulate the activities of non-members who enter into consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements; and (2) a tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct affect on the political integrity, the economic security, or the health and welfare of the tribe. Thus, it is clear that the Supreme Court has determined that the sovereign power of Indian tribes to regulate the activities of non-members on fee lands is limited.

The *Montana* test has been applied to a variety of cases in which Indian tribes have purported to exercise civil authority over non-Indians.[3] As previously noted, in *Strate v. A–1 Contractors* the Supreme Court extended the *Montana* analysis to public rights-of-way and held that the Three Affiliated Tribes, having provided easements to the State of North Dakota for the rights-of-way, lacked the power to assert a landowner's right to occupy and exclude. The state highway in *Strate* was built on a right-of-way granted by the federal government pursuant to 25 U.S.C. §§ 323–325. The Supreme Court considered the following factors before concluding that the state highway was the equivalent of non-Indian fee land:

(1) the legislation creating the right-of-way;

(2) whether the right-of-way was acquired with the consent of the tribe;

(3) whether the tribe had reserved the right to exercise dominion and control over the right-of-way;

(4) whether the land was open to the public; and

(5) whether the right-of-way was under state control

520 U.S. 438, 454–456, 117 S.Ct. 1404. In *Strate*, Supreme Court also held that the *Montana* analysis applied not only to the regulatory authority of Indian tribes over non-members, but also to their adjudicatory authority:

As to non-members, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction .... subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts with respect to non-Indian fee lands generally "does not extend to the activities of non-members of the tribe." *Strate*, 520 U.S. 438, 453, 117 S.Ct. 1404.

*Montana* clearly established the standard for determining whether an Indian tribe's regulatory activities constitute an exercise of its sovereign powers *or* an unwarranted intrusion into areas outside the tribe's jurisdiction. *Strate* limits tribal court power over non-members to the *Montana* analysis. For the reasons set

---

**3.** *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989)(zoning regulations); *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993)(regulation of fishing on Lake Oahe); *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001)(striking down tribal hotel tax assessed against non-Indian hotels); *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001)(striking down tribal court jurisdiction over civil claims against state officials who entered tribal land to execute search warrant).

forth below, the Court concludes that the *Montana* analysis and framework is applicable whether the easements are located on tribal, trust, or fee lands.

### B. STATUS OF THE COOPERATIVES' RIGHTS–OF–WAY.

■ The preliminary issue that needs to be addressed is the status of the rights-of-way which run throughout the Reservation. As previously noted, approximately 140 miles of the rights-of-way retained by the Reservation Telephone Cooperative run on non-Indian land and 120 miles run on Indian trust land. The Cooperatives contend that all of the rights-of-way are the "functional equivalent" of non-Indian land. The Defendants contend that the rights-of-way held by the Cooperatives are distinguishable from the rights-of-way in *Strate v. A–1 Contractors*.

In *Nevada v. Hicks*, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), the United States Supreme Court essentially eliminated the need to consider land status as the initial test for the application of the analysis required under *Montana*.[4]

The Court concludes, as a matter of law, that *Nevada v. Hicks* stands for the general proposition that the *Montana* "rule", or *Montana's* analysis and limitation on tribal authority over non-members, applies to all Reservation lands regardless of land ownership or land status. The rights-of-way at issue in this dispute which exist throughout the Fort Berthold Indian Reservation are on either non-Indian land or the "functional equivalent" of non-Indian land as recognized under *Strate v. A–1 Contractors*. Under *Strate*, the possessory interest tax should be subjected to a *Montana* analysis. In summary, the Cooperatives' rights-of-way are the equivalent of non-Indian fee land for the purpose of considering the limits of the Tribe's regulatory jurisdiction.

### C. THE COOPERATIVES HAVE NOT ENTERED INTO A CONSENSUAL RELATIONSHIP WITH THE THREE AFFILIATED TRIBES.

As noted, the Supreme Court in *Montana* held that a tribe cannot regulate Reservation land owned in fee by non-members of the tribe unless there is an express delegation of power from Congress *or* the regulation meets the criteria for one of the enunciated exceptions. To demonstrate a Congressional delegation of power, an express authorization is required. *Strate v. A–1 Contractors*, 520 U.S. 438, 445, 117 S.Ct. 1404, 137 L.Ed.2d 661; *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1216

---

**4.** In a concurring opinion in *Atkinson*, Justice Souter was joined by Justices Kennedy and Thomas in urging the application of *Montana's* main rule to issues of tribal jurisdiction over non-Indians "regardless of whether the land at issue is fee land or land owned by or held in trust for an Indian tribe." 532 U.S. 645, 660, 121 S.Ct. 1825, 149 L.Ed.2d 889. Justice Souter was again joined by Justices Kennedy and Thomas in writing a concurring opinion in *Nevada v. Hicks* which recognized the practical difficulties in the application of *Montana* to both tribal and fee lands. Justice Souter wrote:

A rule generally prohibiting tribal courts from exercising civil jurisdiction over non-

members, without looking first at the status of the land on which the individual claims arise, also makes sense from a practical standpoint for tying tribes' authority to land status and the first instance would produce an unstable jurisdictional crazy quilt.
533 U.S. 353, 383, 121 S.Ct. 2304.

Finally, in *Nevada v. Hicks*, Justice O'Connor indicated that the *Montana* rule and analysis applies regardless of land status when she stated as follows:

Today, the court, finally resolves that *Montana v. U.S.*, . . . governs a tribe's civil jurisdiction over nonmembers regardless of land ownership.
533 U.S. at 387, 121 S.Ct. 2304.

(9th Cir.2001) *(en banc).* Neither the 1901 Act nor the 1948 Act which authorized the Secretary of the Interior to grant rights-of-way over Indian lands for the construction of the telephone lines explicitly addressed the tribe's authority to tax the Congressionally-conferred right-of-way. Simply stated, there is no express delegation of power from Congress which justifies the tribe's possessory interest tax on rights-of-way on the Reservation. Therefore, the tax is only permissible if the Three Affiliated Tribes can justify it under one of the two *Montana* exceptions.

The first *Montana* exception applies when "a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribes or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. U.S.,* 450 U.S. 544, 565, 101 S.Ct. 1245; *see Atkinson Trading Co., Inc. v. Shirley,* 532 U.S. 645, 656, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001) (*"Montana's* consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself"). The Court concludes, as a matter of law, that the Cooperatives have not entered into a "consensual relationship" with the tribe or its members as a result of providing telecommunication services on the Reservation, or as a result of the sale and service of telephone equipment.

The rights-of-way obtained by the Cooperatives through a Congressional grant do not equate to a "consensual relationship" with the tribe because federal law requires the Cooperatives to obtain rights-of-way and provides a statutory mechanism to acquire the rights-of-way. "A right-of-way created by a congressional grant is a transfer of a property interest that does not create a continuing consensual relationship between a tribe and the grantee." *Burlington Northern R.R. Co. v. Red Wolf,* 196 F.3d 1059, 1064 (9th Cir.1999). Thus, the *Montana* "consensual relationship" exception has no application to the facts of this case.

The North Dakota Supreme Court also addressed this issue in a case entitled *In re Application of Otter Tail Power Co.,* 451 N.W.2d 95 (N.D.1990). The Supreme Court was asked to apply *Montana's* main rule and the two recognized exceptions to the provision of electrical services to the Fort Totten Indian Reservation. The North Dakota Supreme Court went through a detailed analysis to determine the parameters of a consensual relationship dealing with a supplier of electricity and the consumer of electricity. In order to provide electrical service, as well as telephone services in the State of North Dakota, a public utility must obtain a Certificate of Public Convenience and Necessity from the Public Service Commission. The purpose of obtaining these certificates is to "keep to a minimum the wasteful duplication of capital-intensive utility services and conflicts between suppliers." 451 N.W.2d 95, 104. The North Dakota Supreme Court held that because of the unique relationship between a cooperative and its customer, it is inaccurate to view a request for service by a potential electric customer from an electric supplier as forming a "consensual relationship" similar to that which occurs in other commercial contexts. 451 N.W.2d 95, 105. As a result, the North Dakota Supreme Court held that the *Montana* "consensual relationship" exception was not applicable to the case of a provider of electrical services.

The Cooperatives in this dispute fall within the general jurisdiction of the North Dakota Public Service Commission which has the authority to require them to obtain Certificates of Public Convenience

and Necessity in order to serve the public. The Cooperatives have obtained such certificates from the Public Service Commission which grants them exclusive rights for telephone and telephone Internet services in a specified area unless similar authority is granted to another cooperative by the PSC. The Cooperatives received their authority to operate and provide telecommunication services on the Reservation from a grant of legislative authority which does not equate with a "consensual relationship" to satisfy the *Montana* test. The Court concludes, as a matter of law, that the telecommunication services provided by the Cooperatives to the Three Affiliated Tribes are not of a consensual nature to satisfy the first *Montana* exception.

The second exception under *Montana* which would allow taxation by the tribe is for "conduct of non-Indians on fee lands ... when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. 544, 566, 101 S.Ct. 1245. In assessing taxation alleged to be justified under the second *Montana* exception, the United States Supreme Court's decision in *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 656 n. 12, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001) is enlightening:

> *Montana's* second exception "can be misperceived." The exception is only triggered by non-member conduct that threatens the Indian tribe; it does not broadly permit the exercise of civil authority wherever it might be considered "necessary" to self-government. Thus, unless the drain of the non-member's conduct upon tribal services and resources is so severe that it actually "imperils" the political integrity of the Indian tribe, there can be no assertion of civil authority beyond tribal lands.

The Defendants have wholly failed to establish that *Montana's* second exception applies and justifies the imposition of a possessory interest tax. The Cooperative's actions of providing telecommunication services, and the related sales and service of telephone equipment, do not endanger the tribe's political integrity, the economic security, or the health or welfare of the tribe. *See Yellowstone County v. Pease*, 96 F.3d 1169, 1176 (9th Cir.1996)(denying a *Montana* second exception claim because of a failure to establish a direct effect on the political integrity, the economic security, or the health and welfare of the tribe as a whole). None of the decisions rendered by the Tribal Court or the Northern Plains Intertribal Court of Appeals even addressed the application of the second *Montana* exception because it clearly would not be triggered in this case.

The burden of establishing that either of the *Montana* exceptions applies so as to justify the imposition of a possessory interest tax on rights-of-way is on the Defendants as the proponents of the tax. The Defendants have failed to sustain that burden of proof. The second *Montana* exception is only triggered by non-member conduct that threatens the Indian tribe. It does not permit the exercise of civil authority when it may arguably be considered "necessary" to self-government. The Cooperatives provide valuable telecommunications services to the Reservation and no reasonable argument has been made, or could be made, that such services pose a threat to the tribe or endanger its political integrity so as to invoke the second *Montana* exception.

In conclusion, an evaluation of the possessory interest tax which the Defendants seek to enforce against the Cooperatives demonstrates that it is an impermissible tax. The tax has no nexus to any of the

business activities of the Cooperatives. Because neither of the *Montana* exceptions apply, the Three Affiliated Tribes lack jurisdiction to impose a possessory interest tax on the Cooperatives' rights-of-way. The tax constitutes an invalid and impermissible tax that has not been shown to be justified under any of the *Montana* exceptions.

## III. *CONCLUSION*

The Court concludes, as a matter of law, that summary judgment of dismissal is appropriate and warranted in this case on behalf of the Cooperatives. The possessory interest tax imposed by the Three Affiliated Tribes in December of 1990 would only be permissible if justified under one of the two *Montana* exceptions. The Defendants have failed to meet their burden of proof and have wholly failed to show that either of the *Montana* exceptions applies. There is no principled reason to depart from the holdings of the United States Supreme Court in *Montana* and *Strate*. The Court concludes that the Three Affiliated Tribes lacks the legislative authority to promulgate a tax of this nature to be assessed against the Cooperatives. The Three Affiliated Tribes are permanently enjoined from enforcing such an impermissible tax against the Cooperatives under the circumstances.

Accordingly, the Motion for Summary Judgment of Plaintiff Reservation Telephone Cooperative is **GRANTED** (Docket No. 17); the Motion for Summary Judgment of Plaintiff West River Telecommunications Cooperative is **GRANTED** (Docket No. 19); and the Defendant's Cross-Motion for Summary Judgment is **DENIED** (Docket No. 21). Judgment is entered in favor of the Plaintiffs/Cooperatives.